IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Crim. No. 23-428 (RAM) |
| BRYAN ROSA-UFRED | |
| Defendant. | |

**REPORT AND RECOMMENDATION**

On November 27, 2023, Defendant Bryan Rosa-Ufred was charged with violations of 18 U.S.C. § 922(g) and 18 U.S.C. § 922(o). Docket No. 9. Defendant filed a motion to suppress. Docket No. 29. The United States opposed at Docket No. 35 and Defendant replied at Docket No. 38. The matter was referred to the undersigned for a hearing and Report and Recommendation. Docket Nos. 41-42. An evidentiary hearing was held on September 26, 2024 and October 24, 2024. See Docket Nos. 58, 61. The Government presented the testimonies of Puerto Rico Police Bureau ("PRPB") Officers Abraham Loyola-Santos and Roberto Cazul-Claudio and Bureau of Alcohol, Tobacco, Firearm and Explosives (ATF) Task Force Officer ("TFO") Edwin Santos-Martínez. Documentary evidence was admitted. Post-hearing briefs were received. Docket Nos. 71-73. After carefully considering the evidence and arguments, the undersigned recommends that Defendant's motion to suppress be **DENIED**.

**I.    Factual Background**

The following account is drawn from the credible evidence received at the evidentiary hearing.

On November 19, 2023, PRPB agents Loyola-Santos and Cazul-Claudio were instructed to conduct surveillance of an establishment called Copas in Barrio Obrero. Transcript of the Suppression Hearing on September 26, 2024 ("Tr. 09.24") at 11 ¶¶ 8-15; Transcript of Suppression Hearing on October 24, 2024 ("Tr. 10.24") at 16 ¶¶ 17-25. The area of surveillance had been identified as a high-crime area. Tr. 09.24 at 11 ¶¶ 8-11; Tr. 10.24 at 17 ¶¶ 1-2. At around 7:20 a.m., Loyola-Santos was walking down the Los Santos Street towards the Copas establishment

**United States v. Rosa-Ufred**
**Criminal No. 23-428 (RAM)**
**Report and Recommendation**

and saw an individual sitting on a motorcycle. Tr. 09.24 at 12 ¶¶ 11-14, 13 ¶¶ 2-5. The individual on the motorcycle was identified as Defendant. Loyola-Santos observed that the individual on the motorcycle was wearing a black jacket and black clothes, and that he had a firearm on the left side of his waist. Tr. 09.24 at 13 ¶¶ 8-14, 39 ¶¶ 6-9, 40 ¶¶ 16-18. He further observed that the firearm had a distinctive grip because it had a red tape with white letters. Tr. 09.24 at 13 ¶¶ 8-14, 58 ¶¶ 1-3. Loyola-Santos was approximately 15 feet away from the Defendant when he saw the firearm. Tr. 09.24 at 14 ¶¶ 1-2, 39 ¶¶ 6-9, 57 ¶¶ 21-25, 58 ¶¶ 1-3; Joint Exhibits I and I-D. Upon seeing the gun, Loyola-Santos gave a signal to Cazul-Claudio to communicate to him that there was something illegal.[1] Tr. 09.24 at 14 ¶¶ 6-20; Tr. 10.24 at 19 ¶¶ 19-21. Cazul-Claudio, who was on the sidewalk close to the Defendant, observed that the Defendant was carrying a firearm with a read elastic band with the words "Supreme" on the handle on the left side of his waist, and an extended clip in his right pocket. Tr. 10.24 at 24 ¶¶ 1-5, 20 ¶¶ 1-2, 33 ¶¶ 7-8, 35 ¶¶ 1-3; Joint Exhibits I, I-D and I-G. Cazul-Claudio was less than one foot away from the Defendant when he made the observations. Tr. 10.24 at 20 ¶¶ 3-7. Cazul-Claudio approached the Defendant. Joint Exhibit I. Cazul-Claudio grabbed him by the biceps. Tr. 10.24 at 20 ¶¶ 10-13. The Defendant resisted the arrest or made a gesture as if he was going to turn on the motorcycle. Tr. 09.24 at 15 ¶¶ 15-25, 44 ¶¶ 24-25, 45 ¶¶ 1-15; Tr. 10.24 at 20 ¶¶ 10-13. Defendant was then taken to the ground. Tr. 10.24 at 20 ¶¶ 10-13; Joint Exhibit I.

PRPB seized from the Defendant a firearm and three magazines loaded with rounds of ammunition. Tr. 09.24 at 16 ¶¶ 3-8; Government Exhibits 1-2. The firearm had an attachment on the slide that allowed it to fire automatically. Tr. 09.24 at 16 ¶¶ 12-13; Government Exhibit 3. Loyola-Santos gave Defendant verbal <u>Miranda</u> warnings. Tr. 09.24 at 19 ¶¶ 4-13. Defendant made incriminating statements at the arrest. Tr. 09.24 at 19 ¶¶ 16-21. ATF TFO Santos-Martínez and another officer interrogated Defendant at 2:30 p.m. on the day of the arrest. Tr. 10.24 at 7 ¶¶ 5-13. Prior to the interview, Defendant was read <u>Miranda</u> warnings and he signed the form waiving his right to counsel and to remain silent. Tr. 10.24 at 7 ¶¶ 18-20; Government Exhibit 4. Defendant understood the rights and agreed to answer questions without the presence of counsel. Tr. 10.24 at

---

[1] There is conflicting evidence as to whether the signal was a verbal one or whether Loyola-Santos snapped his fingers to indicate that the individual on the motorcycle was carrying a firearm. Regardless of the nature of the signal, the testimony of both Loyola-Santos and Cazul-Claudio was that, after a signal from Loyola-Santos, Cazul-Claudio was first alerted to the presence of a firearm.

10 ¶¶ 20-25. Defendant admitted having had possession of the firearm. Tr. 10.24 at 11 ¶¶ 22-23. He also admitted having knowledge that the firearm was modified to shoot automatically. Tr. 10.24 at 12 ¶¶ 1-4. Defendant appeared calm. Tr. 10.24 at 12 ¶ 7. The interview of Defendant by ATF was conducted at the PRPB Metro Drugs Division in Guaynabo and it was conducted while PRPB had custody of the Defendant. Tr. 10.24 at 12 ¶¶ 12-19 ("Once we finished the interview with Mr. Rosa-Ufred, we called the police agents that held his custody, and he was taken out and put back in the cell at the division.").

## II.     Discussion

### 1.     The Firearm, Magazines, and Ammunition

The Fourth Amendment prohibits unreasonable searches and seizures in the absence of a warrant supported by probable cause. U.S. Const. amend. IV. A Fourth Amendment seizure occurs when a police officer restrains the liberty of a citizen through physical force or show of authority. United States v. Camacho, 661 F.3d 718, 725 (1st Cir. 2011) (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). A seizure without a previous warrant is unreasonable unless it falls under one of very limited exceptions. One of such exceptions is the Terry stop. Under Terry v. Ohio, 392 U.S. 1 (1968), a warrantless stop may be reasonable if the officer suspects that the person apprehended is committing or has committed a crime. Camacho, 661 F.3d at 726; United States v. Monteiro, 447 F.3d 39, 43 (1st Cir. 2006). The inquiry is two-fold: "whether the officer's action was justified at its inception, and whether the stop was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20; United States v. Ruidiaz, 529 F.3d 25, 28-29 (1st Cir. 2008).

An officer's action is justified at inception if it is reasonable under the circumstances. A reasonable suspicion is necessary. Terry, 392 U.S. at 28; United States v. Jones, 700 F.3d 615, 621 (1st Cir. 2012). Reasonable suspicion is more than a mere hunch but less than probable cause. Camacho, 661 F.3d at 726 (citation omitted); Jones, 700 F.3d at 621 (reasonable suspicion is an intermediate standard; its assessment depends on a practical, commonsense judgment based on the particular facts of each case). It requires a "particularized and objective basis for suspecting the person stopped of criminal activity." Camacho, 661 F.3d at 726 (citation omitted). Therefore, to justify the stop, the suspicion must be "objectively reasonable" and "grounded in specific and articulable facts." Id. (citation omitted); Terry, 392 U.S. at 21-22. The Government bears the

burden of showing that a reasonable suspicion justified the stop. Monteiro, 447 F.3d at 43. The Court looks at the totality of circumstances. Camacho, 661 F.3d at 726 (citation omitted); Jones, 700 F.3d at 621. But the inquiry under Terry does not end with a finding of reasonable suspicion. For the warrantless stop to be valid, "the scope of the detention must be carefully tailored to its underlying justification." Florida v. Royer, 460 U.S. 491, 500 (1983) (citations omitted). To find that it was, the stop must have been "temporary and last no longer than necessary to effectuate the purpose of the stop" and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id. The Government again bears the burden. Id. at 497 (citations omitted).

Defendant argues that PRPB agents did not have reasonable suspicion to stop him because they could not have seen the firearm prior to intervening with him. The Defendant relies on the video taken from a near-by establishment on the day and time of the intervention, and on the fact that the Defendant was wearing black pants and a black sweatshirt, arguably making it impossible for the agents to see the firearm on his waist. Docket No. 29 at p. 5. The video was introduced in evidence as Joint Exhibit I. The video shows the entire chain of events leading up to Defendant's seizure and arrest. Defendant appears wearing all black clothing and walking towards a motorcycle. He then sits on the motorcycle and starts to speak with a female. Cazul-Claudio is then seen walking down the street and crossing towards the sidewalk next to where the Defendant was sitting on the motorcycle. Cazul-Claudio is seen looking towards the Defendant, approaching the Defendant, and grabbing the Defendant by the arms. Lastly, there is a struggle and the Defendant and the motorcycle fall to the ground while other police officers, including Loyola-Santos, approach and join in effectuating the arrest and search of the Defendant. To be sure, no firearm can be seen in the video and, from watching the video, it is impossible to know when Loyola-Santos and Cazul-Claudio first observed the firearm on Defendant's waist. But the angle and distance from where the video was taken is unhelpful. It is virtually impossible to see Defendant's waist, his pockets, and much less the viewpoint of the agents right before the intervention. And the testimonies of Loyola-Santos and Cazul-Claudio align. On the day of the events, they were conducting surveillance in a high-crime area. Tr. 09.24 at 11 ¶¶ 8-11; Tr. 10.24 at 16 ¶ 16. Loyola-Santos testified that he first saw the firearm on Defendant's waist when he was walking down the street and was approximately 15 feet away from the motorcycle. Tr. 09.24 at 14

**United States v. Rosa-Ufred**
**Criminal No. 23-428 (RAM)**
**Report and Recommendation**

¶¶ 1-2. He also testified that he made a signal to Cazul-Claudio, who was farther ahead and closer to the Defendant, to alert of the fact that Defendant had a firearm. Tr. 09.24 at 14 ¶¶ 8-15. Cazul-Claudio testified that he heard the signal when he was on the sidewalk and turned to look at the Defendant. Tr. 10.24 at 19 ¶¶ 19-25, 20 ¶¶ 1-13. And that when he approached the Defendant and leaned in, he was able to see the firearm in the left side of Defendant's waist and an extended clip in his right pocket. It was then, as testified by Cazul-Claudio, that he proceeded to grab the Defendant by the biceps. Loyola-Santos and Cazul-Claudio were credible, and their testimonies are largely consistent with the visual depiction in the video. Both agents testified that what prompted the warrantless seizure of the Defendant that morning was the sighting of a firearm and, in the case of Cazul-Claudio, the sighting of the extended clip. They also confirmed that, despite the black clothing worn by the Defendant that day, prior to intervening with the Defendant, they saw the firearm in the left side of his waist, including the distinctive feature in the handle of the firearm (the red elastic band with the words "Supreme" in white on the handle). United States v. Tanguay, 918 F.3d 1, 5 (1st Cir. 2019) (sight of a gun in the driver-side door justified Terry stop); Schubert v. City of Springfield, 589 F.3d 496, 501-02 (1st Cir. 2009) (reasonable suspicion when officer saw a man carrying a gun in high crime area as he walked towards a public building); United States v. Young, 105 F.3d 1, 7-8 (1st Cir. 1997) (sight of a gun justified the Terry stop as reasonable).

      Defendant challenges the reasonableness of the stop by arguing that, because the agents did not know whether Defendant had a license to carry a firearm prior to the intervention, the mere sighting of the firearm on Defendant's waist was insufficient for the agents to suspect that the Defendant was committing a crime. Defendant rests on the Puerto Rico Weapons Act of 2020, P.R. Laws Ann. tit. 25 §§ 461 et seq. (herein, the "P.R. Weapons Law"). Specifically, Defendant points to the Spanish version of Section 462a(e)(1) and (e)(1)(D) of the P.R. Weapons Law, which states that a person who has a license to carry a firearm must carry the firearm in a concealed fashion **or** not brandished and that any person with a firearms license who carries a brandished **or** non-concealed firearm will be subject to a fine. P.R. Laws Ann. tit. 25 § 462a(e)(1) (emphasis added). Defendant thus argues that what the law requires is that a person with a firearms license carry the firearm concealed or, alternatively, without brandishing it. On the other hand, the Government relies on the English translation of Section 462a(e)(1)(iv), which states that a person

5

**United States v. Rosa-Ufred**
**Criminal No. 23-428 (RAM)**
**Report and Recommendation**

who has a firearms license must carry the firearm concealed **and** not brandished, and that law enforcement officers may impose a fine on any licensed person for carrying, operating, or transporting weapons **brandishing rather than concealing them**. P.R. Laws Ann. tit. 25 § 462a(e)(iv) (emphasis added). There is no question that the use of the conjunction "or" in the Spanish version of the statute tends to indicate a choice or alternative, whereas the use of the conjunction "and" in the English translation tends to indicate that both elements are prohibited. But an examination of the language used in other subsections of Section 462a(e) of the Spanish version of the P.R. Weapons Law supports the conclusion that the requirement is for individuals with firearms license to carry their firearms concealed and not brandished. For instance, as an exception to the requirements set forth for the ordinary citizen with a firearms license, Section 462a(e)(4) of the P.R. Weapons Law states that law enforcement agents and unformed private security guards with a firearms license in the exercise of their duty may carry their firearm openly or "de forma expuesta" and may carry an additional firearm concealed and not brandished. P.R. Laws Ann. tit. 25 § 462a(e)(4). Likewise, Section 462a(e)(5) of the P.R. Weapons Law provides that persons who are authorized and engaged in lawful target shooting or hunting may carry their firearm openly or "de forma expuesta" within the premises where the activity is being conducted. Id. at § 462a(e)(5). And Section 462a(e)(10) of the P.R. Weapons Law provides that every person who carries a firearm in Puerto Rico must comply with the requirement that the firearms and ammunition be transported in a closed case or in a way that is concealed not brandished. Id. at § 462a(e)(10). This understanding of the current P.R. Weapons Law is consistent with the view expressed by several Justices of the Puerto Rico Supreme Court in Pueblo v. Báez López, 189 D.P.R. 918 (2013).

The controversy in Báez López, 189 D.P.R. 918, 944, 947 (2013), centered around the reasonableness of a warrantless search and seizure of a firearm and the application of the perception exception to the warrant requirement. The Puerto Rico Supreme Court held that the exception applied and that suppression of the evidence was unwarranted. Three of the Justices of the Puerto Rico Supreme Court joined in dissent.[2] The dissenting opinion discusses the requirements of the 2000 Puerto Rico Weapons Law, which was codified in P.R. Laws Ann. tit.

---

[2] This decision does not have an official English translation. In keeping with the requirements of our Local Rule 5(c), an English certified translation of the dissenting opinion in Báez López will be uploaded to the record in due course.

6

25 §§ 455 et seq. The dissenting opinion makes specific reference to that statute's Article 2.02, which regulated firearms licenses, and to Section 456a(D)(1) that, like Section 462a(e)(1) and (e)(1)(D) of the current P.R. Weapons Law, established that persons with a firearms license had to carry and transport those firearms "de forma oculta o no ostentosa" (**concealed or not brandished**) (my translation). Id. at 963 (emphasis added). In explaining that requirement, the dissenting Justices expressed that any citizen who obtains a license to carry firearms may do so if the firearm is carried **concealed and not brandished**. Id. at 966, 970 (emphasis added) ("[I]n our jurisdiction, for example, any citizen that meets certain reasonable criteria for a license to carry, may carry a firearm, as long as the firearm is carried in a concealed manner and not brandished.") That is, even though the previous statute also contained the conjunction "or" between the words "concealed" and "not brandished," the interpretation of those dissenting Justices of the Puerto Rico Supreme Court was that the law required firearm license holders to carry their firearm concealed and not brandished. This is also entirely consistent with the testimony of both Loyola-Santos and Cazul-Claudio, who understood Puerto Rico law to allow public carrying of firearms with a license only if the firearm is not exposed or brandished. Tr. 09.24 at 34 ¶¶ 4-9, 43 ¶¶ 1-3, 47 ¶¶ 19-25, 48 ¶¶ 1-4; Tr. 10.24 at 21 ¶¶ 6-10, 39 ¶¶ 1-5.

But even if we were to deem that agents Loyola-Santos and Cazul-Claudio were mistaken in their understanding of the law and that a person with a firearms license in Puerto Rico (not included in the exceptions set forth in Sections 462a(e)(4) and 462a(e)(5) of the P.R. Weapons Law) may open carry his weapon and is only prohibited from brandishing the firearm, such a mistaken understanding would be excused pursuant to the U.S. Supreme Court's decision in Heien v. North Carolina, 574 U.S. 54 (2014). The U.S. Supreme Court in Heien considered whether a police officer's reasonable mistake as to the law could give rise to the reasonable suspicion necessary to uphold a seizure under the Fourth Amendment. The agents in Heien stopped a vehicle for not having one of the two brake lights working. The agents eventually found cocaine in the vehicle and charged the defendant with trafficking cocaine. The lower court denied the motion to suppress the evidence found in the car but a court of appeals held that, because the state statute only required a single working brake light and there was no dispute that the vehicle of the defendant did have one working break light, the stop of the defendant and the subsequent seizure and arrest was unreasonable. Id. at 59. The U.S. Supreme Court disagreed. The Court expressed

7

that the touchstone of the Fourth Amendment is reasonableness. Id. at 60. The Court explained that "[to] be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" Id. at 60-61 (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)). The Court further explained that it had previously held that an agent who makes a factual mistake may nonetheless have reasonable suspicion to effectuate a warrantless stop. Id. at 60. And reasoned that "reasonable men [also] make mistakes of law [ ] and such mistakes are no less compatible with the concept of reasonable suspicion." Id. at 61. But that because "an officer can gain no Fourth Amendment advantage through a sloppystudy of the laws he is duty-bound to enforce," the Fourth Amendment tolerates only mistakes of law that are objectively reasonable. Id. 66–67. Resting on the unclear language of the statute at issue in Heien, the Court determined that the officer's mistake about the brake-light law was reasonable and that the stop was lawful under the Fourth Amendment. Id. at 67-68. It is my view that pursuant to Heien and the conflicting language of the statute, as well as considering the expressions of the dissenting Puerto Rico Supreme Court Justices in Báez López on the significance of a language that is exactly like the language in Section 462a(e) of the P.R. Weapons Law, any mistake by the agents on the scope of the concealment requirement in the statute would be objectively reasonable.

Defendant also argues that to the extent that the P.R. Weapons Law prohibits the open carry of firearms, the statute would be unconstitutional under the U.S. Supreme Court decision in New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1 (2022), and could not be the basis for the agent's reasonable suspicion. At issue in Bruen was whether a New York statute that required establishing special circumstances to obtain a license to publicly carry firearms was at odds with the right to keep and bear arms in the Second Amendment. The Court held that the statute was unconstitutional. Id. at 39. The Court set out a new analytical framework for any statute that regulates rights contemplated in the Second Amendment. To survive constitutional scrutiny, any such regulation must be consistent with the Nation's historical tradition of firearm regulation. Id. at 17. Bruen requires courts to apply two steps: (1) when the Second Amendment's plain text covers an individual's conduct, it should be deemed that the Constitution presumptively protects the conduct, and (2) the Government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Id. at 24. But a "historical

8

twin" is not necessary; a "historical analogue" suffices to pass constitutional muster. Id. at 30. In striking the New York statute, the Court held the following: the two law-abiding adult citizens challenging the New York statute were part of "the people" protected by the Second Amendment (id. at 31-32), the handguns that were the object of the statute were weapons commonly used today for self-defense (id. at 32), the right to "bear" arms includes the right to publicly carry firearms (id. at 32), and the American government has not broadly prohibited the public carry of commonly used firearms for personal defense, nor has it required law-abiding citizens to demonstrate a "'special need for self-protection distinguishable from that of the general community' in order to carry arms in public." (id. at 70) (citations omitted). The Bruen decision did not address whether a firearms license holder can be required to carry his firearm in a concealed fashion.

Defendant argues that post Bruen courts across the country have held that the mere sighting of a firearm does not give rise to a constitutionally sufficient reasonable suspicion. Docket No. 38 at pp. 2-3. Defendant discusses two cases in support of that premise: United States v. Jones, 708 F.Supp.3d 1365 (N.D.Il., Dec. 22, 2023) and United States v. Homer, 2024 WL 1533919 (E.D.N.Y., April 9, 2024). But the context in which these two cases were decided is distinguishable from this case. A Chicago Police Department officer in Jones observed city cameras in a high crime area and observed a bulge under defendant's waistband. Jones, 708 F.Supp.3d at 1369. The officer believed that the bulge was a gun. Id. The defendant was observed as he entered a car and, after running the license plate of the car, officers learned that the owner of the car had a suspended license. Id. The agents did not know whether the owner of the car had a firearms license or whether the defendant was the registered owner of the car. Id. The agents approached the defendant after he parked and exited the car. Id. The defendant was not stopped for any other traffic violation. Id. The agents seized the gun from the car and asked the defendant whether he had a firearms license. Id. at 1370. The defendant informed that he did not have a firearms license and he was arrested. Id. After conducting a hearing, the court found that the Government failed to establish that they learned of the car owner's suspended license before the stop and that the stop was solely motivated by the sighting of the firearm. Id. at 1371-1373. Turning to the suspicion about the gun, the court in Jones asked whether a state's legalization of concealed carry affects the reasonableness of an officer's suspicion that the possession of a firearm is evidence of a crime. Id. at 1374. The court concluded that "[i]n jurisdictions where citizens can legally carry concealed weapons, the mere

possession of a concealed weapon, without more, cannot support a reasonable suspicion that the suspect is illegally carrying that gun." Id. at 1375. It thus held that because the defendant had been observed with "a bulge concealed under his clothes," the agents' suspicion that the defendant possessed a firearm illegally, rather than with a license, could only be characterized as a hunch. Id. The difference between Jones and this case is evident as the Defendant's firearm here was visible. The Jones decision was not based on Bruen principles but on the limitations of the state statute which "permit[ted] properly licensed citizens to carry concealed firearms" and the Government had only seen a bulge on defendant's waistband. Id. at 1374.

The decision in Homer is not helpful to Defendant either. One of the issues in Homer was the New York statute that criminalizes possession of a firearm post Bruen. After the Bruen decision, New York's statute which required establishing proper cause to obtain a firearms license to public carry a firearm was invalidated. The defendant in Homer had been observed with a visible firearm in a high crime area. United States v. Homer, 2024 WL 1533919 at *3. The Government argued that, even though New York was now a "shall issue" state, the exemption from prosecution for being a firearms license holder is an affirmative defense to be advanced by the defendant, so changes in the licensing requirements post Bruen did not affect the "probable cause calculus." Id. The Homer court rejected the Government's arguments mainly because these were deemed waived. Id. at *4. Undoubtedly, the net of the Homer decision was that, regardless of whether the defendant's firearm was visible or displayed with "no firearm discipline," absent information that the defendant did not have a firearms license, the agents in New York did not have probable cause to stop the defendant post Bruen. Id. at *8. But, as expressly recognized in Homer, the Government's position was fatally undermined by its failure to assert any post-Bruen arguments in a timely fashion. Indeed, the court in Homer concluded with the following: "The issue presented in Mr. Homer's case involved the intersection of a newly expanded Second Amendment with the legal protections of the Fourth Amendment in a state that had limited public gun carriage for over a hundred years. The extent to which police can infer a lack of licensure from the suspect's conduct in a state that now has limited discretion in declining to issue concealed carry licenses **is not settled. While the issue is undoubtedly close, the Government has failed to demonstrate that reconsideration is warranted**." Id. at *18 (emphasis added). Not only is the decision in Homer not binding on this Court, but it must also be taken for what it is— a very narrow holding driven

by the Government's procedural default in not raising substantive arguments in a timely fashion. And, contrary to Defendant's argument, note 6 of the Homer decision is a string citation of mostly pre-Breun decisions that would not affect the outcome of this case. See id. at *7 n.6.

In any event, even if the P.R. Weapons Law could run afoul of Bruen because firearms license holders cannot be required to carry their firearms concealed, Defendant has not pointed to any decision holding the statute unconstitutional. My research has revealed none either. As far as agents Loyola-Santos and Cazul-Claudio were concerned, on November 19, 2023, Section 462a(e) of the P.R. Weapons Law was good law and a visible violation of the concealment requirement could the basis for reasonable suspicion to intervene with the Defendant. As discussed by the U.S. Supreme Court in Heien, when there is no controlling precedent declaring a law unconstitutional, agents are allowed to presume that the law is valid. See Heien, 574 U.S. at 63–64 (discussing Michigan v. DeFillippo, 443 U.S. 31 (1979)). The officers in DeFillippo arrested the defendant for his refusal to identify himself and found drugs in defendant's person after a search incident to the arrest. DeFillippo, 443 U.S. at 35–36. The question before the Court was "whether an arrest made in good-faith reliance on an ordinance, which at the time had not been declared unconstitutional, [was] valid regardless of a subsequent judicial determination of its unconstitutionality." Id. at 33. In answering in the affirmative, the Court in DeFillippo expressed the following: "Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement." Id. at 38; United States v. Pappas, 613 F.2d 324, 331 (1st Cir. 1979) (discussing DeFillippo and similarly rejecting to apply the exclusionary rule). Agents of the PRPB could reasonably rely in the concealment requirement set forth in the P.R. Weapons Law on November 19, 2023.

Both Loyola-Santos and Cazul-Claudio articulated specific and objective facts for suspecting that Defendant was incurring in criminal activity by carrying a non-concealed firearm on his waist and an extended clip in his pocket. The agents' observation of the firearm in what they had already identified as a high crime area and their perception that Defendant may have been

attempting to flee when approached by law enforcement[3], reasonably bolstered their suspicion. Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000) (that the stop occurs in a high crime area and the defendant attempts to flee are relevant considerations in the analysis). The firearm, magazine, and ammunition were seized from the Defendant immediately after the stop. There is thus no question that the stop was not unreasonably extended before the agents could confirm the criminal conduct by Defendant. Defendant's Fourth Amendment rights were not infringed.

### 2. The Incriminating Statements

Pursuant to the Fifth Amendment of the United States Constitution, no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Premised on this constitutional right, the U.S. Supreme Court in Miranda v. Arizona, 384 U.S. 436, 444 (1966) held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." United States v. Lugo Guerrero, 2005 WL 8163207, at *6 (D.P.R., Oct. 14, 2005). The procedural safeguards under Miranda require that the suspect be adequately and effectively appraised of his rights, and that the exercise of those rights be honored by law enforcement. Missouri v. Seibert, 542 U.S. 600, 608 (2004). The Fifth Amendment privilege against self-incrimination requires that, prior to questioning a suspect, the police appraise the suspect of his right to remain silent and to have counsel present during questioning, that counsel could be appointed free of charge, and of the state's intention to use any of his statements to secure a conviction. Moran v. Burbine, 475 U.S. 412, 420 (1986) (discussing Miranda, 384 U.S. at 468-470, 473-474). The Court is required to presume that a defendant did not waive his Miranda rights. United States v. Downs-Moses, 329 F.3d 253, 267 (1st Cir. 2003) (citation omitted); United States v. Carpentino, 948 F.3d 10, 26 (1st Cir. 2020). The burden is on the Government to prove a valid waiver by the preponderance of the evidence. Id.; Colorado v. Connelly, 479 U.S. 157, 168 (1986); Carpentino, 948 F.3d at 26. The inquiry is two-fold: (1) the relinquishment of rights must be a free and deliberate choice, absent intimidation, coercion, or deception, and (2) the waiver must be made with full awareness of the nature of the rights being abandoned and of the consequences of such abandonment. Moran, 475

---

[3] Defendant disputes that he was attempting to flee at Docket No. 29-1 ¶ 5. But the testimony of both agents confirmed **their perception** that Defendant attempted to flee when approached by Cazul-Claudio.

U.S. at 421 (citations omitted); Carpentino, 948 F.3d at 26. Police coercion is a necessary element for a finding involuntariness in waiving rights under Miranda. Connelly, 479 U.S. at 167; United States v. Boskic, 545 F.3d 69, 78 (1st Cir. 2008).

According to the evidence presented during the hearing, Defendant made incriminating statements to law enforcement on two occasions. The first was at the time of his arrest. Tr. 09.24 at 19 ¶¶ 16-21. Defendant has not made arguments for the suppression of those statements, other than those immersed in the challenge to the legality of the stop and arrest of the Defendant. The second set of incriminating statements were made to ATF agents during an interview of the Defendant at the PRPB Metro Drugs Division in Guaynabo. This interview was conducted at 2:30 p.m. on the day of the arrest. Present during the interview were ATF TFO Santos-Martínez and another officer. Tr. 10.24 at 7 ¶¶ 5-13. Defendant was read Miranda warnings in Spanish and signed the form in Spanish waiving his right to counsel and to remain silent. Tr. 10.24 at 7 ¶¶ 18-20; Government Exhibit 4. As it appears in the Miranda form, Defendant was appraised of his right to remain silent, that anything he said could be used against him, of his right have counsel present during any interview and that he could be appointed counsel before answering any questions, and of his right to stop the interview at any time. See Government Exhibit 4. Defendant placed his initials next to each line describing the rights and signed the waiver form. Id. In signing the form, Defendant acknowledged that he read and understood his rights, that he was willing to answer questions without the presence of counsel, and that he had not been made promises or been pressured or forced to sign the waiver of rights. Id. The form is also signed by Santos-Martínez and another ATF officer. Santos-Martínez testified that Defendant understood and agreed to answer questions without the presence of counsel, that he admitted having had possession of the firearm, and that he had knowledge that the firearm had been modified to shoot automatically. Tr. 10.24 at 10 ¶¶ 20-25, 11 ¶¶ 22-23, 12 ¶¶ 1-4. He also testified that Defendant appeared calm during the interview. Tr. 10.24 at 12 ¶ 7. There is thus strong evidence of Defendant's voluntary relinquishment of rights and his awareness of the nature of the rights being abandoned. See United States v. Hunter, 2007 WL 9627982 (D.P.R., July 9, 2007) (string citations omitted); Missouri v. Seibert, 542 U.S. at 608-609 ("giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over

voluntariness tends to end with the finding of a valid waiver.") (citation omitted); see e.g., United States v. Van Dusen, 431 F.2d 1278, 1280 (1st Cir. 1970) (defendant appeared to have read and understood written waiver of rights, evidence of voluntariness); United States v. Lugo Guerrero, 524 F.3d 5, 8, 12 (1st Cir. 2008) (defendant read form, initialed each line, said he understood and signed forms; waiver found); Hunter, 2007 WL 9627982 *4 (document read in Spanish, defendant appeared to understand explanations and what was being read, and document signed; waiver found); United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000) (agent recited Miranda rights from form, defendant expressed to have understood, defendant read and understood waiver form and initialed and signed waiver; waiver found).

Defendant challenges the admissibility of the incriminating statements claiming violations to the McNabb-Mallory rule, Rule 5(a) of the Federal Rules of Criminal Procedure, and 18 U.S.C. § 3501. According to Defendant, after his arrest at approximately 7:30 a.m. he was "left to stew" in detention for seven (7) hours prior to being interrogated in violation of his right to prompt presentment. Under Rule 5(a)(1)(A) of the Federal Rules of Criminal Procedure, "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge." Fed.R.Crim.P. 5(a)(1)(A). Under the McNabb-Mallory rule, confessions made during a period of detention that violates the prompt presentment requirement of Rule 5(a) are inadmissible in evidence. Casey v. United States, 100 F.4th 34, 43 (1st Cir. 2024) (citations omitted). The foregoing rule was codified in 18 U.S.C. § 3501 but the statute provides that any such confessions "shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention." 18 U.S.C. § 3501(c). As such, voluntary confessions made within six hours of detention are not inadmissible solely because of a delay in bringing the defendant before a magistrate judge, and confessions outside the six hours may be admissible if voluntary and the delay in bringing the defendant before a magistrate judge was reasonable "considering the means of transportation and the distance to be traveled to the nearest

available such magistrate judge or other officer." Casey, 100 F.4th at 43 (citations omitted); 18 U.S.C. § 3501(c); Corley v. United States, 556 U.S. 303, 322 (2009).

The Rule 5 prompt presentment requirement applies only to a period of federal detention. Casey, 100 F.4th at 45 (citations omitted). The rationale is that there is no duty to take a defendant before a magistrate judge until the defendant has been arrested or detained for a federal crime. United States v. Alvarez-Sánchez, 511 U.S. 350, 358 (1994). As such, when a defendant is in state custody pending state charges, the Rule 5 requirement is not implicated. But, as contemplated by the First Circuit in Casey, there may be circumstances when a defendant is in state custody and the right to prompt presentment attaches. This can happen when the federal authorities have decided to charge the defendant of a federal crime but have left the defendant under state custody. Casey, 100 F.4th at 47-48. Nevertheless, when a person is under arrest solely for state charges, the right to prompt presentment does not attach regardless of whether the arresting officers believe that the person may have incurred in conduct that violates federal law or the person has made incriminating statements to federal agents. United States v. Smith, 608 F.3d 1270, 1278 (10th Cir. 2010) (citing Alvarez-Sánchez, 511 U.S. at 358-359 (1994)).

The evidence in this case established that Defendant was arrested by state law enforcement agents for a violation to the P.R. Weapons Law. He was taken into custody and held in state custody at the PRPB Metro Drugs Division in Guaynabo. ATF agents conducted Defendant's interview approximately 7 hours after his arrest by PRPB. There is no indication that, at the time the interview was conducted, federal agents had decided to charge the Defendant with a federal crime. Rather, the evidence established that Defendant was in state custody before the interview and returned to state custody thereafter. See Tr. 10.24 at 12 ¶¶ 12-19 ("Once we finished the interview with Mr. Rosa-Ufred, we called the police agents that held his custody, and he was taken out and put back in the cell at the division."). Indeed, at the time of the arrest, PRPB agents were unaware that Defendant had a criminal record. PRPB agents intervened with the Defendant solely for violation to the P.R. Weapons Law. Tr. 09.24 at p. 43 ¶¶ 10-12; Tr. 10.24 at p. 39 ¶¶ 1-5. Defendant points to the Booking Information Form prepared by the U.S. Marshals Service to establish that Defendant was arrested by ATF on November 19, 2023 for violations of 18 U.S.C. §§ 922(g)(1) and 922(o). Docket No. 38-1. But that form does not indicate the time in which ATF assumed jurisdiction or decided to charge Defendant with federal offenses. As testified by Santos-Martínez,

**United States v. Rosa-Ufred**
**Criminal No. 23-428 (RAM)**
**Report and Recommendation**

it was during the interview that Defendant admitted having a criminal history related to a state murder charge and having knowledge that the firearm found in his possession had been modified to shoot automatically. As such, it is reasonable to conclude that, while ATF may have assumed jurisdiction of the Defendant on November 19, 2023, they did so after the interview where the Defendant admitted to essential elements of the federal offenses charged. And, consequently, that at the time ATF conducted the interview, Defendant was not in federal custody or pending federal charges and the six-hour prompt presentment clock had not begun to run. See e.g. United States v. Malavé, 2014 WL 12626355, at *4 (D.P.R., July 2, 2014) (report and recommendation adopted by 2014 WL 12626354) (interview while in state custody did not trigger Section 3501(c)); United States v. Pagán Santos, 2022 WL 2447684, at *15 (D.P.R. July 6, 2022) (report and recommendation adopted on November 9, 2022).

Having found that the interview was conducted while Defendant was under state custody is sufficient to reject Defendant's claimed violation of his right of prompt presentment. But it bears noting the following. Even if the interview would have been conducted more than six hours after Defendant's arrest by federal agents, there is sufficient evidence to conclude that the incriminating statements were made voluntarily after an informed and uncoerced waiver of Miranda rights (see Pagán Santos, 2022 WL 2447684, at *21) and that any delay in bringing the Defendant before a magistrate judge was reasonable. Defendant was arrested by PRPB in the morning of November 19, 2023, which was a Sunday. He was interviewed on Sunday at 2:30 p.m. by ATF agents. The affidavit in support of the criminal complaint and the criminal complaint in this case were sworn and issued at 2:20 p.m. on November 20, 2023. Docket No. 1. The Court can take judicial notice that Monday, November 20, 2023, was a holiday observed by the United States District Court for the District of Puerto Rico. See Notice from the Clerk No. 22-08 dated August 24, 2022. The Defendant was brought before the Court for an Initial Appearance before U.S. Magistrate Judge Marshal D. Morgan on November 21, 2023 at 11:18 a.m. On the day of Defendant's arrest and the following day, this District Court was closed. When the court is closed for operations, there are obvious difficulties in bringing a defendant for an initial appearance. "[A]n initial appearance requires the participation of: 1) a courtroom deputy to open court and run the audio recording device to create a record of the proceeding, 2) a Spanish language interpreter for nearly every case handled in this district, 3) an assistant federal public defender on duty to meet with and orient the

16

defendant as to the charges and the maximum penalties, and 4) one or more deputy U.S. Marshals to take custody of the defendant after he has completed his initial appearance and to transport him to MDC to be housed pending further legal proceedings. The availability of all of these individuals is difficult to coordinate under normal circumstances, but relatively impossible to coordinate in the middle of the night or over the weekend when the Court is closed." Pagán Santos, 2022 WL 2447684, at *26. Any delay in this case was thus reasonable as it was "caused by administrative concerns, such as unavailability of a magistrate judge following an arrest." Casey, 100 F.4th at 44 (citations omitted).

### III.     Conclusion

For the reasons discussed above, I find that there was reasonable suspicion to stop the Defendant on November 19, 2023 and that his Fourth Amendment rights were not infringed. I also find that the interview of the Defendant was not made in violation of his right of prompt presentment and that the incriminating statements made by him during that interview were made after a valid waiver of his Miranda rights. I recommend that Defendant's motion to suppress at Docket No. 29 be **DENIED.**

**IT IS SO RECOMMENDED.**

This Report and Recommendation is issued pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections must be specific and must be filed within fourteen (14) days of its receipt. Failure to file timely and specific objections to the Report and Recommendation is a waiver of the right to review by the District Judge and of appellate review. Thomas v. Arn, 474 U.S. 140, 154-155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992).

In San Juan, Puerto Rico, this 14th day of March, 2025.

s/Giselle López-Soler
GISELLE LÓPEZ-SOLER
United States Magistrate Judge